## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## KANSAS CITY DOCKET

**UNITED STATES OF AMERICA**,
*Plaintiff-Respondent*,

v.                                    Case No. **15-CR-20078**

**DESMOND GAINES**,
*Defendant-Movant*.

_____

**MOVANT'S PETITION FOR RELIEF UNDER <u>28 U.S.C. § 2255</u>**
_____

## INTRODUCTION

Desmond Gaines moves this Court for an order vacating his conviction and discharging him. That conviction, and his resulting sentence, were reached in violation of the United States Constitution. As a person accused of committing a crime, Mr. Gaines had a right to counsel. The United States violated that right. It purposefully intruded into his relationship with his attorneys by purposefully obtaining recordings of his meetings with his attorneys. The United States had no legitimate law-enforcement purpose for acquiring these recordings. Yet, by obtaining them, it became privy to Mr. Gaines's confidential communications with his attorneys.

Those acts constitute a per se violation of Mr. Gaines's right to counsel. To remedy that violation, the Court should look at the recurring, widespread misconduct of the United States Attorney's Office for the District of Kansas and conclude that only discharging Mr. Gaines from further prosecution will sufficiently deter future conduct. In the alternative, the Court should grant Mr. Gaines an evidentiary hearing.

## FACTS COMMON TO ALL CLAIMS

The United States filed a complaint against Mr. Gaines on August 25, 2015. Doc. 1.[1] After a first appearance, the magistrate ordered the United States Marshals Service to detain Mr. Gaines pending trial. Doc. 6. The Marshals Service detained Mr. Gaines at the Leavenworth Detention Center (LDC), a private jail owned by Corrections Corporation of America.[2]

On April 1, 2016, Mr. Gaines met with his attorneys, Laquisha Ross and Kirk Redmond, in an attorney-client meeting room at the LDC.

---

[1] Unless otherwise stated, citations prefaced with "Doc." refer to filings in Mr. Gaines's criminal case, 15-CR-20078-JAR.

[2] Though Corrections Corporation of America "has since been renamed CoreCivic," this Motion refers to the company as "CCA" to avoid confusion. *United States v. Black et al.*, 2:16-CR-20032-JAR, Doc. 758 at 3, n.5 (D. Kan. Aug. 13, 2019). Mr. Gaines will refer to the Court's August 13, 2019 Findings of Fact and Conclusions of Law in *Black* as the "*Black* Order). He will refer to other filings and exhibits in *Black* as "*Black* Doc." and "*Black* Ex.," respectively. He further asks the Court to take judicial notice of the record in *Black* because those materials "bear directly upon the disposition of the case at hand." *United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007).

Exs. 1, 2. Three days later, Mr. Gaines and Ms. Ross notified the Court that Mr. Gaines intended to change his plea to guilty. Docs. 21, 22. Mr. Gaines and the Government had reached an agreement to a plea to a superseding information, charging a single count of possessing cocaine base with the intent to distribute it. *See* Doc. 136 at 3. The plea agreement was made under Federal Rule of Criminal Procedure 11(c)(1)(C), calling for an 84-month sentence. *See id.*

The Court scheduled a change-of-plea hearing for May 16, 2016. Doc. 22. Less than two weeks before that hearing, Ms. Ross met with Mr. Gaines at the LDC, again in an attorney-client meeting room. Ex. 2. The next week, Mr. Gaines notified the Court that he no longer wished to change his plea. Doc. 23. The Court converted the May 16 change-of-plea hearing into a status conference. *Id.*

At that May 16 status conference, Mr. Gaines requested a trial setting. Doc. 136 at 2. Terra Morehead, the Assistant United States Attorney prosecuting Mr. Gaines, made representations to the Court about how it had relied on Mr. Gaines's intent to change his plea. *Id.* at 3-6. Ms. Morehead told the Court:

- The Government "hadn't gotten the drug analysis back[]" at the time it reached a plea agreement with Mr. Gaines on April 4. *Id.* at 3.

- The Government had not finished analyzing "all" of "[t]he drugs in this case" but Ms. Morehead anticipated, when they were analyzed, "that the drug quantity will far exceed the 28-gram limit." *Id.* at 4.[3]

- The parties had reached the 84-month plea agreement because "it avoided the government from having to do additional testing [of the drug quantities]." *Id.* at 5.

- If Mr. Gaines insisted on a trial, the government would "go forward with all of the testing… ." *Id.* at 5-6.

Ms. Morehead also announced the penalties Mr. Gaines would now face for exercising his right to trial. Along with the additional drug-testing it planned to do, Ms. Morehead declared that the Government would file a notice under Section 851. Doc. 136 at 4. That notice, Morehead explained, would increase Mr. Gaines's mandatory-minimum

---

[3] The 28-gram limit likely refers to 21 U.S.C. § 841(b)(1)(B), which imposes a mandatory-minimum sentence of five years' imprisonment for offenses involving that amount of cocaine base.

sentence on Count 1 from five years' to ten years' imprisonment. *Id.* at 4. Coupled with the consecutive, mandatory-minimum sentence of five years on the § 924(c) charge, Mr. Gaines would be facing at least 15 years in prison. *Id.* at 4-5. In other words, rather than receive a near-certain 7-year sentence, Mr. Gaines would now face a minimum 15-year sentence — or another eight years in prison. *See id.*

The next day, the Government obtained recordings of meetings between Mr. Gaines and his attorneys. *Black* Order at 66. Though neither Mr. Gaines nor his attorneys knew it, the LDC video-recorded the meetings between attorneys and clients in its attorney-client visitation rooms. Exhibits 1, 2, attached; *see also Black* Order at 64 (finding CCA did not notify attorneys or defendants that cameras in the rooms were recording, rather than just monitoring, meetings). The LDC gave those recordings to the Government in response to a grand-jury subpoena, along with a "one-page index" that stated the recordings included footage from the attorney-client visitation rooms. *Black* Order at 66. Assistant United States Attorneys Erin Tomasic and Kim Flannigan would later try to use the attorney-client-room recordings "to gain a strategic advantage over a defendant" in an unrelated case, and then mislead the Court about it. *Id.* at 54, 73-75, 80.

After the Government's possession of these recordings emerged, Mr. Gaines filed a motion under Federal Rule of Criminal Procedure 41(g), asking for their return. Doc. 29. It does not appear that the Court ever ruled on it. *See* Doc. 29-124.

As trial approached, the Government made good on Ms. Morehead's promise to seek the maximum sentence possible against Mr. Gaines. First, the Government asked the lab to retest the drugs — twice — to elevate Mr. Gaines's potential sentence. *See* Doc. 89. It then filed notices of Mr. Gaines's prior convictions under 21 U.S.C. § 851. Doc. 59. Ms. Morehead planned to "rely" on those convictions "to request increased punishment" for Mr. Gaines. *Id.* at 1. If Mr. Gaines were convicted, just one of those prior convictions would increase his mandatory-minimum sentence from five years in prison to ten. *See* 21 U.S.C. § 841(b)(1)(B) (2017).

After four days of trial, the jury convicted Mr. Gaines on all counts. Doc. 117. At his sentencing hearing, the Court credited Mr. Gaines for completing the 12-step program at the LDC, finding he had "worked hard to complete" the program. Doc. 143 at 15. But the law compelled the Court to impose a minimum sentence of 180 months — 120 months on Count 1 and 60 months on Count 4, consecutive to each other. *See*

Doc. 124. The Court duly imposed that sentence, while running his sentences on the other counts concurrent to the 180-month sentence. *See id.*

For reasons irrelevant to this Motion, the Tenth Circuit remanded the case to this Court, Doc. 46, this Court reached the same conclusion as it had before, Doc. 165, and the Tenth Circuit affirmed it. *United States v. Gaines*, 857 F. App'x 454, No. 19-3177 (10th Cir. 2021) (unpublished). The United States Supreme Court denied his petition for certiorari on November 15, 2021. Doc. 183.

Mr. Gaines later moved this Court for compassionate release, arguing that he would have received a lower sentence had the Fair Sentencing Act and the Department of Justice's EQUAL-Act policy been in place at the time of his original sentencing. *See* Doc. 185. The Government concurred with Mr. Gaines's request, Doc. 188, and the Court granted it — lowering Mr. Gaines's sentence to 46 months on Counts 1, 2, 3 and 5. Docs 189, 190. With the 60-month consecutive sentence on Count 4, this reduction left Mr. Gaines with a total sentence of 106 months' imprisonment. Doc. 190 at 1.

## ARGUMENTS & AUTHORITIES

The Government violated Mr. Gaines's Sixth-Amendment rights when it obtained video recordings of his meetings with his attorneys and became privy to the communications contained within them, without a legitimate law-enforcement purpose. That violation warrants relief commensurate with the United States Attorney's Office's pattern of misconduct. The extent of that misconduct has yet to be fully unmasked, mainly because of the USAO's refusal to comply with this Court's factfinding orders.

Thus, based on the pattern of misconduct already discovered and the USAO's obscuring of additional misconduct, this Court should vacate Mr. Gaines's convictions and discharge him. In the alternative, this Court should set an evidentiary hearing so the Court can determine the true breadth and depth of the USAO's violations, which the Court must consider in fashioning an appropriate remedy.

**I.   The United States of America violated Mr. Gaines's constitutional right to counsel when it obtained video recordings of his meetings with his attorneys and became privy to their communications.**

Federal law gives a prisoner the right to ask the sentencing court to vacate his sentence if it "was imposed in violation of the Constitution or laws of the United States… ." 28 U.S.C. § 2255(a). The Sixth

Amendment to the United States Constitution guarantees effective assistance of counsel to those accused of crimes. U.S. Const. amend. VI. This guarantee gives the accused two rights. First, it bestows the general right to counsel — the "absolute right to be represented by an attorney in a criminal proceeding that could result in imprisonment." *Black Order* at 148 (citing *United States v. Nichols*, 841 F.2d 1485, 1496 n.7 (10th Cir. 1988)). Second, it bestows the specific right to effective assistance of counsel at trial to "ensur[e] a fair trial… ." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 145 (2006).

Relevant here, the Government denies an accused both these rights when: (1) there is a protected attorney-client communication; (2) the government purposefully intrudes into the attorney-client relationship; (3) the government becomes "privy to" the attorney-client communication because of its intrusion; and (4) the intrusion was not justified by any legitimate law enforcement interest. *Shillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1995). A movant must make out a prima facie case that satisfies each factor. *Id.* at 1140 (citation omitted). A movant who clears these hurdles establishes a "direct interference with" that movant's "Sixth Amendment rights" that constitutes "a *per se* violation" of those rights. *Id.* at 1142. This per se

violation triggers a presumption of "a prejudicial effect on the reliability of the trial" itself. *Id.* That prejudice presumption relieves a movant's traditional burden of establishing a resulting prejudice: "prejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost." *Id.* (quoting *Strickland v. Washington*, <u>466 U.S. 668, 692</u> (1984)).

Like most defendants, Mr. Gaines cannot point to a specific trial advantage the United States gained by obtaining the recordings of his meetings with his attorneys. That inability is why the Tenth Circuit does not require him to show a certain prejudice: "an intrusion" into the attorney-client relationship constitutes a "*per se*" Sixth Amendment violation and the "prejudicial effect" of that violation "must be presumed." *Shillinger*, <u>70 F.3d at 1142</u>.

### A.  *Mr. Gaines fulfills this Court's procedural requirements to bring a claim based on the Government's acquisition of video recordings of his meetings with his attorneys.*

Mr. Gaines assumes the Court's familiarity with the *Black* case, the § 2255 motions it spawned, and the procedural rules it created to deal with those motions. *See United States v. Black* ("*Black*"), 2:16-CR-20032-JAR, *In re CCA Recordings 2255 Litigation* ("*CCA Lit.*"), 2:19-CV-2491-JAR-JPO. Mr. Gaines falls into the category of defendants who did

not plead guilty and whose video recordings were obtained before their conviction. For defendants in that category, the Court determined that the following threshold showings must be made after review and verification by the FPD in each case: (1) the video of the attorney-client meeting exists; and (2) the quality of the non-verbal communication in the video is sufficient to confirm communication between the detainee and counsel. *Black* Order at 165. This threshold showing also requires an affidavit from defense counsel confirming that the nature and purpose of the meetings were within the ambit of protected communication, including, but not limited to, defense preparation, plea negotiations, or review of discovery. *Id.* at 163, 166.

This Motion meets those thresholds. Undersigned counsel has reviewed the video recordings and determined they are of sufficient quality to determine that communication occurred between Mr. Gaines and his attorneys. *See Black* Order at 165. Mr. Gaines has also attached declarations from the attorneys present at those meetings, which similarly fulfill the prerequisites to establishing Mr. Gaines's Sixth-Amendment claim. Exs 1, 2.

## B.   *The meetings between Mr. Gaines and his attorneys contained protected attorney-client communications.*

To establish a *Shillinger* violation, a movant first must show the existence of a "confidential" communication between him and counsel. 70 F.3d at 1142. A communication between an attorney and client is confidential or privileged if it related "to legal advice or strategy sought by the client." *Black* Order at 164 (citations omitted). The communication need not be audible: "non-verbal communication falls within the ambit of privileged, confidential attorney-client communications." *Black* Order at 164 (internal quotation omitted). The declarations by Mr. Gaines's trial counsel establish as much. *See* Exs 1, 2. Both show that the quality of the video was enough to reveal non-verbal communication between Mr. Gaines and his counsel. And that those meetings all contained communications relating to legal advice or strategy that Mr. Gaines sought.

## C.   *The Government purposely intruded into Mr. Gaines's attorney-client relationship by obtaining recordings of his meetings with his attorneys.*

The second requirement of a *Shillinger* violation is a "purposeful intrusion into the attorney-client relationship...." 70 F.3d at 1142. What does it mean to "purposefully intrude" into that relationship? The Supreme Court has found that an undercover agent's attendance at an

attorney-client meeting was "not" an "intrusion at all" because the agent "was invited to the meeting…for the benefit of [the defendant] and his lawyer." *Weatherford*, <u>429 U.S. at 557</u>. Thus, there is no intrusion if the Government is "invited" into an attorney-client meeting — even under false pretenses — for the benefit of the defendant or her attorney. So the converse must be true: the Government intrudes when it is present at an attorney-client meeting without invitation.

In *Shillinger*, the defendant was in the custody of the local jail, forcing the defense attorney to have (and pay for) a deputy's presence during trial-preparation sessions with the defendant. <u>70 F.3d at 1134</u>. The prosecutor later asked the deputy about what had occurred during those sessions. *Id.* at 1135. The court defined the prosecutor's act as "an intrusion into the defendant's trial preparation sessions…." *Shillinger* at 1134. Unlike the agent in *Weatherford*, the prosecutor in *Shillinger* never set foot in the room during any attorney-client communications. Rather, he relied on someone who was in the room (the deputy) to relay the communications to him. The court did not find that the deputy's presence during the meetings was an intrusion. Rather, the intrusion occurred only when the prosecutor asked the deputy about what had happened during the trial-preparation sessions.

The contours of an intrusion lie between *Shillinger*'s intrusion and *Weatherford*'s non-intrusion. The agent in *Weatherford* did not intrude because he was invited to attend a meeting. The prosecutor in *Shillinger* did intrude because he was not invited to the trial-preparation sessions. The *Weatherford* agent did not intrude because his purpose in attending the meeting was not to acquire confidential communications. The prosecutor in *Shillinger* did intrude because his purpose in asking the deputy about the preparation sessions was to acquire those communications. Thus, the Government intrudes into the attorney-client relationship when, without invitation from the defendant or defendant's attorney, it seeks to obtain confidential communications between a defendant and an attorney.

That is what the USAO did here. *Black* began as a routine contraband-trafficking investigation into the LDC. *Black* Order at 68. The United States Secret Service agent in charge of the investigation drafted a tailored subpoena, asking the LDC "for video recordings from specific areas" of the LDC "where there was suspicion of contraband trafficking…." *Id.* at 68. But a prosecutor "redrafted the subpoena to include video records of all areas of [the LDC], without [the agent's] knowledge." *Id.* at 68. When the prosecutor redrafted the subpoena, she

knew "it would include video of attorney visitation rooms…." *Black*
Order at 79-80. Yet there was no evidence of any contraband-trafficking
in those rooms before the USAO issued the subpoena. *See id.* (agent
could not recall if he knew about evidence of contraband trafficking in
attorney-visitation rooms before the subpoena was issued).

It became apparent that the USAO's purpose in obtaining the
attorney-visitation-room video was not to investigate contraband
smuggling. Over the next two months, the USAO kept the recordings in
its office — "accessible" to prosecutors — and distributed copies to other
law-enforcement agencies. *Id.* at 80. Yet there is no evidence that anyone
reviewed the attorney-visitation footage looking for contraband
smuggling. *See Black* Order, 66-80. Rather, once it had them, the
Government sought to review the attorney-client recordings to acquire
confidential communications. Two AUSAs told a defense attorney that
an agent was reviewing footage from attorney-client meetings to
determine whether that attorney had given a document to a defendant.
*Id.* at 72. The AUSAs used the threat of that review to urge the attorney
to withdraw from the case. *See id.* at 71-72.

Based on this record, the Court can conclude that the USAO's
purpose in obtaining the recordings of the attorney-visitation rooms was

to intrude, without invitation, into the non-verbal communications between attorneys and clients. First, the agent leading the investigation sought a subpoena requesting only video from the areas that suspected trafficking was occurring. It was the USAO that broadened the subpoena to request video of the attorney-visitation rooms, even though there was no evidence contraband was trafficked there. Second, there is no showing that any agent reviewed the attorney-visitation-rooms video to look for contraband-trafficking evidence. Third, the only time an agent of the USAO reviewed the video was to look for evidence of communication between an attorney and a client. Fourth, when the USAO was confronted about its possession of these videos, it became evasive. Fifth, when asked to preserve the AVPC's metadata — the only evidence that could show who viewed the recordings — the USAO assured the Court it would, but then erased that data. These facts are enough for the Court to conclude that the USAO's purpose in obtaining the video of the attorney-visitation rooms was to acquire communications between defendants and attorneys.

### D.     The Government became privy to Mr. Gaines's communications with his attorneys by obtaining the recordings of his meetings with his attorneys.

The third element of a *Shillinger* violation requires a movant to show that the Government became "privy to" confidential communications between the movant and her attorney. 70 F.3d at 1142. Yet the Government destroyed any chance Mr. Gaines had of establishing this element. Highly summarized, the recordings of his communications with his attorneys could be viewed only on a particular computer within the USAO — the "AVPC." *See Black* Order at 34-35. Despite its knowledge that the AVPC was important to future litigation, internal recognition of its duty to preserve evidence, and external demands that it do so (including court orders), the USAO allowed the data on the AVPC to be erased. *See id.* That erasure meant no one could determine whether anyone in the USAO had viewed any of the recordings. *See id.* at 35.

This act was one of many that the USAO took to frustrate the factfinding process in *Black* and *CCA Lit.* — ending with its notice to the Court that it would simply stop complying with the Court's discovery orders. *CCA Lit.*, Doc. 540. That prompted this Court to make an adverse-inference finding under Federal Rule of Civil Procedure 37. *CCA*

*Lit.*, Doc. 587. The Court would "take as established" that, before a petitioner "was convicted," "each member of the prosecution team became 'privy to' each recording" of their attorney-client meetings. *Id.* at 13.

This Motion qualifies for that inference. The Government first obtained the recordings of Mr. Gaines's meetings with his attorneys on May 17, 2016. *Black* Order at 66. The USAO kept those recordings until August 2016. *Id.* at 139. Mr. Gaines was convicted on September 22, 2017. Doc. 117. Thus, each member of the prosecution team became privy to both recordings of protected communications before Mr. Gaines's conviction.

### E.  *The Government lacked any legitimate law-enforcement purpose for obtaining recordings of Mr. Gaines's meetings with his attorneys.*

The final element of a *Shillinger* violation requires a movant to show that the Government's intrusion into the attorney-client relationship lacked a legitimate law-enforcement purpose. 30 F.3d at 1142. At the outset, it is not entirely clear who has the burden on this element. Yet it makes sense that the Government would bear it. This element acts like an affirmative defense: it admits all the elements of a violation (purposeful intrusion, becoming privy to communications), but

claims an exemption that excuses the conduct. *See*, *e.g.*, *Black's Law Dictionary* (11th ed. 2019) (defining "affirmative defense" as an "assertion" that will "defeat" a claim "even if all the allegations in a complaint" are proven). It is the party invoking an affirmative defense that bears the burden of proving it. *See*, *e.g.*, *id.* (the party raising an affirmative defense "bears the burden of proving" it). And the Government will always be in a superior position to prove a legitimate-law-enforcement exception; because it can marshal evidence and arguments to prove that exception.

Here, the burden is irrelevant because this Court has already held that the USAO's intrusion is not legally excused. "[T]here was no legitimate law-enforcement purpose in the USAO's acquisition of video recordings of attorney visitation rooms." *Black* Order at 177. As applied here, the Court's holding means the Government had no legitimate purpose in acquiring recordings of Mr. Gaines's communications with his attorneys.

## II. The Court should vacate Mr. Gaines's convictions because that is the only remedy that gives any force to constitutional protections.

If a court determines "there has been such a denial or infringement of the constitutional rights of the prisoner as to render the

judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside… ." 28 U.S.C. § 2255(b). After vacating a judgment, a court has broad "discretion to fashion an appropriate remedy." *United States v. Pearce*, 146 F.3d 771, 775 (10th Cir. 1998) (citing § 2255). Those remedies fall generally into four categories: (1) "discharge the prisoner," (2) "grant [the prisoner] a new trial," (3) "re-sentence [the prisoner]," or (4) "correct the [prisoner's] sentence." 28 U.S.C. § 2255(b).

The court need not select a remedy that merely compensates a defendant for his loss; it may select a remedy to deter the perpetrator of that loss. The Tenth Circuit recognized as much in *Shillinger*: "no other standard can adequately deter this sort of misconduct." 70 F.3d at 1142. The Supreme Court has similarly acknowledged that "a pattern of recurring violations" by the Government "might warrant the imposition" of an "extreme remedy in order to deter further lawlessness." *United States v. Morrison*, 449 U.S. 361, 365 n.2 (1981); *see also Brecht v. Abramson*, 507 U.S. 619, 638 n.9 (1993) (a trial error "combined with a pattern of prosecutorial misconduct" can "so infect the integrity of the proceeding" that "habeas relief" is "warrant[ed]" even if otherwise harmless).

The Tenth Circuit's preferred method of determining a remedy in cases like this relies on factfinding to determine "the extent of the prosecutor's intrusion." *Shillinger*, <u>70 F.3d at 1143</u>. Without those facts, a court cannot "determine whether the prosecutor obtained and used other information relevant to" a defendant's "proceedings that may prejudice" that defendant at a retrial. *Id.* Thus, a court cannot conclude "that simply retrying" the defendant "will sufficiently purge the Sixth Amendment taint" caused by "the prosecutor's intrusion… ." *Id.* Rather, a court should use its factfinding ability to "determine the extent of the intrusion" — which should bear on "the proper remedy." *Id.* (citation omitted).

These authorities show that a court should look at both the width and depth of constitutional violations. As the Court held in *Morrison* and *Brecht*, a pattern of recurring violations, across many defendants, may prompt a severe sanction. On the other hand, as the Tenth Circuit recognized in *Shillinger*, a deep number of violations against a single defendant may prompt a similarly severe sanction. In either case, a court must use its factfinding powers to determine how far the lawlessness has spread.

But here the USAO refuses to let the court perform this task. Without chronicling the lengthy procedural history of *Black* and the *In re CCA Litigation* cases, the USAO has a spotty record in complying with this Court's discovery orders. *See, e.g., Black* Order; *see also United States v. Cortes-Gomez*, No. 20-CV-4052-JAR, Doc. 1 at 7-22 (Sep. 10, 2020).[4] The USAO's resistance to its discovery obligations culminated in a flat-out refusal to obey them. *See CCA Lit.*, Doc. 540. So while the Court must engage in a fact-finding process to determine the appropriate remedy for the violation of Mr. Gaines's constitutional rights, the perpetrator of that violation makes that process impossible.

It should not profit from its disobedience. It remains to be seen whether the USAO will refuse to comply with discovery orders or obligations in *this* case. If it does, then Mr. Gaines will ask the Court to infer that the discovery would have produced sufficient evidence of widespread and recurring violations that would justify — but not require — dismissal of an indictment. Mr. Gaines acknowledges that the Court has already drawn a different adverse inference from the USAO's refusal

---

[4] The Petition in *Cortes-Gomez* lays out comprehensive history of the USAO's compliance — or lack thereof — with its discovery obligations. Mr. Gaines incorporates that history by reference here.

Page 22 of 27

to cooperate in discovery. *See CCA Lit.*, Doc. 587. He asks the Court to draw a second one here, for the same reasons the Court drew the first one. *See id.* at 6-15 (citing Fed. R. Civ. P. 37(b)(2)(A)). It does not act as a default judgment because it does not require the Court to impose a particular remedy. And it is tailored to address the harm inflicted by the USAO's anticipated noncompliance.

Even without that inference, the Court has sufficient evidence in the record to dismiss Mr. Gaines's indictment. The USAO's "pattern of recurring violations" "are relevant to the Court's determination of an appropriate remedy." *Black* Order at 181. The Court has chronicled that pattern in its *Black* Order and later orders, as well as in other opinions. *See, e.g., United States v. Orozco*, 291 F.Supp.3d 1267, 1278-79 (D.Kan. 2017) (finding AUSA Morehead interfered with defendant's right to fair trial), *aff'd in part and rev'd in part at* 916 F.3d 919 (10th Cir. 2019); *United States v. Giannukos*, No. 15-CR-20016-DDC, Doc. 198 (D.Kan. May 10, 2021) (concluding AUSA Morehead's "misconduct" was an "unacceptable" failure "to do justice" that merited a substantial sentencing variance); *see also United States v. Humphrey*, 07-CR-20168-JWL, Doc. 1993 at 12-19, 24-33 (D. Kan. Dec. 10, 2021) (motion

itemizing AUSA Morehead's and the USAO's pattern of recurring constitutional violations).[5]

Put simply, even without an evidentiary hearing, this Court has enough evidence of widespread, recurring constitutional violations to justify dismissing the indictment against Mr. Gaines. If the Court concludes otherwise, it should grant Mr. Gaines an evidentiary hearing.

## REQUEST FOR EVIDENTIARY HEARING & CERTIFICATE OF APPEALABILITY

This Court should grant Mr. Gaines an evidentiary hearing on his motion because he has met the "relatively light" burden "for establishing an entitlement to" that hearing. *Turner v. United States*, 183 F.3d 474, 477 (6th Cir. 1999). The court "must assume that" a movant "can prove his allegations." *United States v. Herrig*, 935 F.3d 1102, 1111 (10th Cir. 2019). A court may deny a hearing only if "the motion and the files and records of the case conclusively show" the motion — even assuming the truth of its factual allegations — fails to merit relief. 28 U.S.C. § 2255(b). Without that conclusive showing, a district court abuses it discretion by refusing to hold an evidentiary hearing. *See*, *e.g.*, *Herrig*, at 1111.

---

[5] The Motion in *Humphrey* contains a comprehensive accounting of the repeated and recurring violations of AUSA Morehead and the USAO. Mr. Gaines incorporates that accounting by reference.

Should the Court opt to deny Mr. Gaines any relief, he asks the Court to grant him a certificate of appealability. Mr. Gaines must have that certificate before he may appeal any adverse ruling from this Court. *See, e.g.*, *United States v. Robinson*, No. 13-CV-4099 (citing *United States v. Higley*, No. 17-1111 (10th Cir. Sep. 29, 2017) (unpublished)). To merit the certificate, Mr. Gaines need only "make a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Mr. Gaines has made that showing because "reasonable jurists could debate whether (or, for that matter, agree that)" the Court should have "resolved" his Motion "in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quotations omitted). This burden is light. *See, e.g.*, *Wilson v. Bryant*, 655 F. App'x 636, 641 (10th Cir. 2016) (unpublished). Thus, if the Court concludes that Mr. Gaines does not merit relief, the Court should issue a certificate of appealability.

## CONCLUSION

Desmond Gaines asks this Court to vacate his conviction and discharge him. The United States violated his Sixth Amendment right to counsel when it intentionally intruded into his attorney-client relationship and became privy to his confidential communications with

his attorneys. It intruded into this relationship and acquired those communications without a legitimate law-enforcement purpose. Given the pattern of recurring constitutional violations, no remedy other than discharging Mr. Gaines is enough to deter future misconduct.

Respectfully submitted,

**MORGAN PILATE LLC**

/s/ Branden A. Bell
Branden A. Bell, KS #22618
926 Cherry Street
Kansas City, Missouri 64106
p 816.471.6694
e bbell@morganpilate.com
*Attorney for Desmond Gaines*

## CERTIFICATE OF SERVICE

I certify that I electronically filed a copy of this Motion with the Clerk of the District Court via the CM/ECF system, which shall distribute it to all necessary parties, on November 15, 2022.

/s/ Branden A. Bell